UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------ X
    :
JULIANO TORRES-CUESTA,    :    08-CV-1382 (ARR) (LB)
    :
        Plaintiff,    :    <u>NOT FOR ELECTRONIC</u>
    :    <u>OR PRINT PUBLICATION</u>
    -against-    :
    :    <u>OPINION & ORDER</u>
FRANCIS BERBERICH, EDWIN BENITEZ,    :
ANDREW BUTORAC, and THE UNITED STATES    :
OF AMERICA,    :
    :
        Defendants.    :
    :
------------------------------------------------------------------ X

ROSS, United States District Judge:

        On July 11, 2011, the instant action proceeded to a bench trial before me. Plaintiff

Juliano Torres-Cuesta ("plaintiff" or "Torres") alleges that, on September 6, 2005, the individual

defendants – New York City Police Department ("NYPD") Detectives Francis Berberich and

Edwin Benitez and Drug Enforcement Administration ("DEA") Special Agent ("SA") Andrew

Butorac – used excessive force against him in effecting his arrest in Queens, New York.

Pursuant to <u>Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics</u>, 403 U.S. 388

(1971), plaintiff seeks monetary damages against those officers for violation of his Fourth

Amendment rights. Additionally, under the Federal Tort Claims Act, 28 U.S.C. §§ 1345-46,

1391, 2675 ("FTCA"), plaintiff seeks monetary damages against the United States for the actions

of the arresting officers. The bench trial concluded on July 14, 2011.

        I have carefully considered the evidence before me. The parties presented two very

different versions of plaintiff's arrest at trial. Notably, the only witnesses to that arrest are

plaintiff and the three arresting officers whom he accuses of using excessive force. In order to

decide this case, I therefore must evaluate the credibility of those witnesses. In that regard, I not

only question certain statements made by plaintiff during his testimony, but I also have grave concerns about the testimony of the arresting officers. Whether the parties' troublesome testimony is due to faulty perception or memory, embellishment, a disregard for the truth, or some combination thereof, I cannot say. But I believe that the testimony of each witness, at least in part, is unreliable. As a result, I cannot determine, with any degree of confidence, what in fact transpired on the night of September 6, 2005; and after weighing the parties' testimony, I conclude that the evidence is in equipoise. Thus, solely because the burden of proof rests on plaintiff, and despite my concerns about the veracity of the arresting officers, I am constrained to find that the officers did not use excessive force in violation of the Fourth Amendment and that they did not commit assault and battery under New York law. Accordingly, I hold that the arresting officers are not liable under Bivens and the United States is not liable under the FTCA.

## BACKGROUND

I.      Undisputed Facts

At approximately 8:30 p.m. on the evening of September 6, 2005, members of DEA Joint Narcotics Strike Force Group Z-42 ("Group Z-42") – a law enforcement group comprised of officers from federal, state, and local law enforcement agencies – located Torres' vehicle in front of a garage at 106-33 157th Street in Queens, New York and placed it under surveillance. Defendants SA Butorac and Detective Berberich were co-case agents and responsible for overseeing the surveillance. A number of other members of Group Z-42 assisted in the surveillance, including defendant Detective Benitez and DEA SA Fred DiRenzo. The members of Group Z-42 were in plainclothes and in separate unmarked vehicles parked in the vicinity of the garage. Inside the garage, Torres and another individual, Jesse Arriaga, removed cocaine from a secret compartment in a vehicle in order to transport the drugs elsewhere for sale.

At approximately 9:30 p.m., Torres exited the garage carrying a bag containing the drugs; he got into his vehicle and began to drive on 157th Street. In response, multiple members of Group Z-42 turned their cars onto 157th Street, so that they could apprehend plaintiff. SA DiRenzo attempted to block Torres' path by stopping his vehicle in front of Torres' vehicle on 157th street. Torres then sped up and drove onto the sidewalk in order to get around SA DiRenzo's vehicle. After passing SA DiRenzo, Torres turned right onto another street and fled. SA Butorac and Detectives Benitez and Berberich pursued Torres for approximately five to eight miles; during the chase, Torres drove erratically, disobeying the speed limit and other traffic laws.

The chase ended when Torres drove down the 100 block of 88th Avenue in Queens, a dead-end street. At the dead-end, there was a chain-link fence with a tree-covered hill behind it that led up to train tracks. On both sides of the street, there were residential homes with driveways or alleyways between them. Immediately after Torres turned onto 88th Avenue, SA Butorac, Detective Benitez, and Detective Berberich, respectively, turned onto the street. Torres stopped his car near the dead-end, and the three officers stopped their vehicles a short distance behind him. Shortly thereafter, numerous unidentified NYPD officers in marked police cars also arrived at 88th Avenue. Torres exited his vehicle. After identifying themselves as law enforcement agents, pointing their firearms at Torres, and shouting various verbal commands at him, SA Butorac, Detective Benitez, and Detective Berberich arrested Torres, who was unarmed. As discussed below, Torres and each of the arresting officers gave disparate accounts of the arrest during their trial testimony. The parties agree, however, that the arresting officers used force to effect plaintiff's arrest and that plaintiff sustained injury as a result of that force. Although the parties dispute the extent of plaintiff's injuries, they agree that, at the least, he

sustained multiple abrasions to his face and knees.

Following his arrest, the officers recovered the cocaine from Torres' vehicle. A uniformed NYPD officer drove plaintiff back to the garage at 157th Street, where Group Z-42 reconvened. In response to plaintiff's complaints about pain in his head or face, one of the officers called an ambulance. The ambulance took plaintiff to St. Vincent's Catholic Medical Centers, Mary Immaculate Hospital ("Mary Immaculate Hospital"), where plaintiff was treated for abrasions to his face and knees. He also received a CAT scan of his head, which was negative. Torres was discharged around 2:00 a.m. on September 7, 2005, whereupon he was taken to a DEA office for processing. At approximately 10:15 a.m., after Torres waived his Miranda rights, SA Butorac and Detective Berberich questioned Torres at the DEA office. The officers subsequently brought Torres to the Metropolitan Detention Center ("MDC") in Brooklyn.

On May 19, 2006, before Judge Sterling Johnson in the Eastern District of New York, Torres pled guilty to one count of conspiracy to distribute and possession with intent to distribute a controlled substance. On November 30, 2006, the court sentenced him to 240 months in prison.

II.    Plaintiff's Testimony about His Arrest

Torres testified that, when he began to drive away from the garage on 157th Street, he noticed two cars blocking the road behind him and two cars blocking the road in front of him. Tr. at 47. He claimed that none of the vehicles displayed flashing emergency lights or sounded sirens at that time. Tr. at 49-50, 123. Torres stated that he thought the individuals in the cars were drug dealers who were going to rob him, so he began to flee. Tr. at 123. Eight or nine blocks into the chase, Torres noticed flashing emergency lights on the cars chasing him and at some point he also heard police sirens. Tr. at 51, 125-126. While it occurred to Torres that the

police may have been chasing him, he testified that he was not sure who was in pursuit of him, because he had heard that robbers use lights and sirens to impersonate police officers. Tr. at 52, 132. Torres stated that he drove erratically and disobeyed traffic laws during the chase because he was "panicked." Tr. at 51, 133.

When Torres arrived at the dead-end on 88th Avenue, he exited his vehicle and looked toward the open end of the street. Tr. at 135. There was a line of cars stopped behind his vehicle, and seven to ten police officers were standing in the street with their badges displayed and guns pointed at him. Tr. at 54, 135-136. At the end of the line of cars, he saw a marked police vehicle. Tr. at 55, 136. Plaintiff testified that at that time he still had his doubts that his pursuers were in fact police officers as opposed to robbers. Tr. at 136. Torres stated that the officers began to scream orders at him, which he promptly followed. Tr. at 55. Torres testified that he complied with the officers' commands to put up his hands, to put his hands behind his head, to turn around, and to drop to the ground. Tr. at 55-56, 137. While he was in the process of complying with the officers' order to drop to the ground – he had two knees and one hand on the ground – the officers began to attack him. Tr. at 55, 137.

Torres testified that the attack began with a kick to middle of his back. Tr. at 56-57. The kick pushed Torres face down on the ground. Tr. at 57. Once he was on the ground, the officers started kicking and punching him all over his body. Tr. at 57. Torres attempted to shield his face by crossing his arms in front of his face; he never put his hands underneath his body. Tr. at 57, 60. One of the officers then grabbed and twisted Torres' left arm behind his back. Tr. at 57, 60. The same officer then put his knee on the back of Torres' neck and released his weight onto Torres' neck several times, smashing his face into the pavement. Tr. at 57-58, 60-61. Specifically, Torres stated: "And then this person is going . . . like back and forth, like releasing

the weight and standing up and releasing the weight on my face, and my face is smashing the floor in this moment." Tr. at 58. Torres testified that one of the officers then kicked him in his left ear. Tr. at 58, 140. This blow to the head put Torres in a trance-like state, in which he felt as if he were almost asleep. Tr. at 58. He testified that, in this state, he felt no more pain, but he heard the officers curse at him, as if he were "inside of a swimming pool" and he could "hear people outside screaming." Tr. at 58. Then, all of a sudden, one of the officers screamed "stop," and the officers stopped hitting Torres. Tr. at 58. Torres briefly believed that the attack had ended, but then he was awakened from his dazed state by a strong pain in his left arm. Tr. at 59, 64. Torres claimed that the pain in his arm was caused by the officers lifting him up by his handcuffs. Tr. at 59. Torres started screaming that the officers were breaking his arm. Tr. at 59. The officers told him to shut up, but Torres continued screaming, until one of the officers loosened his handcuffs. Tr. at 59.

Subsequently, the officers sat Torres by the fence at the dead-end while they recovered the drugs from Torres' vehicle. Tr. at 65. Several officers, including Detective Berberich, questioned Torres about where he was taking the drugs and why he fled. Tr. at 66-67. Afterward, the officers lifted Torres up, walked him over to the police car, and threw him against the hood of the car. Tr. at 68. His chest hit the hood of the car, and he went down on his knees in front of the hood. Tr. at 68. One of the officers searched Torres and took two beepers off of his waistband. Tr. at 68. Torres was then placed in the back of a police car and driven back to the 157th Street garage. Tr. at 70.

Torres testified that at the garage SA Butorac questioned him about where he was taking the drugs. Tr. at 71. When Torres refused to answer, SA Butorac threatened to hit him with a foot-long black flash light. Tr. at 71-72. As Torres sat in the garage, his head became very

painful, and he began asking to go to the hospital. Tr. at 73. When the ambulance arrived, one of the paramedics examined Torres. Tr. at 73. After the paramedic finished the examination, Detective Benitez asked the paramedic to "make a good report," and the paramedic smiled and agreed. Tr. at 74. Detective Benitez rode in the ambulance with Torres to the hospital. Tr. at 74. At the hospital, Torres was first seen by a nurse. Tr. at 75-76. Torres testified that one of the officers asked her to "make a good report," and she agreed. Tr. at 75.

The officers then brought Torres to a DEA office. Torres testified that, during questioning by Detective Berberich and SA Butorac at the office, he apologized for leading the officers on a high-speed chase. Tr. at 82. In response, the officers pressed him as to whether he was apologizing for resisting arrest and refusing to follow the officers' commands at the dead-end. Tr. at 82. Torres testified that he insisted to the officers that he was not apologizing for resisting arrest or refusing to follow commands because he did not take those actions. Tr. at 82-83. Detective Berberich then gave Torres a piece of paper and a pen and asked him to write a statement saying that he did not understand the officers' commands at the dead-end. Tr. at 83. Detective Berberich said that such a statement would make Torres "look good before the judge." Tr. at 83. Torres refused to write the statement because he felt as if Detective Berberich was trying to blame him for the arresting officers' attack. Tr. at 83. Torres testified that the attack was not his fault and that he complied with the officers' commands. Tr. at 83. When Torres refused to write the statement, Detective Berberich angrily pulled the paper back. Tr. at 83.

In the weeks following his arrest, while he was at the MDC, Torres had significant pain in his face, head, neck, left ear, left wrist, and left thumb. Tr. at 90. Over time, much of the pain subsided. Tr. at 91. Torres, however, continues to have intermittent pain in his left ear, and he has pain in his left wrist and thumb when he applies pressure to those areas. Tr. at 93-95.

Additionally, in the months following his arrest, Torres developed chronic, daily pain in his neck; an occasional feeling in his back that he is being pricked with needles; and occasional numbness in his hands and fingers. Tr. at 93-94, 99, 106, 107-108. Torres testified that his injuries have severely limited his daily activities and that he has trouble sleeping due to chronic pain. Tr. 108-112.

III.    The Officers' Testimony about Torres' Arrest

The officers' testimony about Torres' arrest can be broken down into five relevant events: (i) the high-speed chase ending at the dead-end on 88th Avenue, (ii) the direction in which Torres fled from the officers at the dead-end, (iii) the force used against Torres after the officers tackled him, (iv) their actions immediately following Torres' arrest, and (v) Torres' post-arrest interview. Set forth below is a summary of the officers' testimony regarding those five events. Where the officers have testified consistently, the summary is derived from the testimony of all three officers. The officers' testimony, however, materially diverges with respect to two events: the direction in which Torres fled and the force used against him on the ground. In addressing those events, I will separately discuss each individual officer's testimony.

A.    *The High-Speed Chase Ending at the Dead-End on 88th Avenue*

With respect to the high-speed chase, the officers testified that, as Torres started to drive toward SA Direnzo's vehicle on 157th Street, SA Direnzo's vehicle had its emergency lights activated. Tr. at 215, 310, 423. After Torres began to flee, Detective Berberich and SA Butorac activated their vehicles' emergency lights and sirens. Tr. at 312, 425. Their vehicles' emergency lights and sirens were activated throughout the duration of the pursuit. Tr. 312, 428. Detective Benitez's vehicle was not equipped with emergency lights or sirens. Tr. at 195.

At the end of the high-speed chase, Torres turned onto 88th Avenue and stopped his

vehicle near the dead-end. Tr. at 223, 317. SA Butorac stopped his car approximately twenty to twenty-five feet behind Torres' vehicle. Tr. at 368. Detective Benitez stopped his vehicle directly behind SA Butorac's vehicle, and Detective Berberich stopped directly behind Detective Benitez's vehicle. Tr. at 224, 470-471. SA Butorac and Detective Berberich still had their vehicles' emergency lights and sirens activated. Tr. at 223, 317, 434. The officers immediately exited their vehicles and drew their weapons. Tr. at 224, 370, 471. SA Butorac was in the center of the block, facing the dead-end, and Detective Benitez was behind SA Butorac to his right. Tr. at 473. After exiting his vehicle, Detective Berberich proceeded toward the dead-end on the left sidewalk. Tr. at 434-435. He moved into a left flanking position; in other words, he moved down the left sidewalk toward the dead-end, past the position of SA Butorac and Detective Benitez, closer to the dead-end than those officers, and to the side of Torres. Tr. at 434-435, 473-474.

When Torres opened his vehicle door and exited, SA Butorac – who was standing behind his vehicle door for cover – immediately told him to get back into his vehicle, but Torres did not comply. Tr. at 318-319. Torres got out of his vehicle and stood next to it, facing SA Butorac. Tr. at 252-253, 319-320, 369. The officers identified themselves as police and screamed several verbal commands at Torres, including telling him to get his hands up and to get on the ground. Tr. at 226, 320, 372, 435-436. The officers did not order Torres to put his hands behind his head; they testified that they would not give such a command because a suspect with his hands behind his head may be able to reach for a weapon. Tr. at 227, 322, 436-437. For a "split-second," Torres stood with his arms bent at about a ninety-degree angle, so that his hands were in front of him and above his waist. Tr. at 369-370. Torres began looking to the left and right, apparently searching for a place to flee. Tr. at 319. He looked "disoriented," "confused," "anxious," and

"nervous" when he was standing next to his vehicle. Tr. at 371. The officers considered Torres armed and dangerous, because he had just led them on a high-speed chase, and because it was their experience that a suspect trafficking in drugs may be armed, dangerous, and under the influence of narcotics. Tr. at 226, 321-322, 438-439. SA Butorac began to approach Torres. Tr. at 320. At that point, Torres turned his back toward SA Butorac and fled. Tr. at 323-324.

> B.     *The Direction in which Torres Fled*

The officers' testimony is materially inconsistent with respect to the direction in which Torres fled. SA Butorac testified about the direction that Torres fled by reference to the positions on a clock; if the center of the dead-end was 12 o'clock, SA Butorac testified that Torres fled from him in the direction of 11 o'clock (that is, to SA Butorac's left), toward the second house from the dead-end. Tr. at 377. SA Butorac stated that Torres fled in that direction for five to fifteen feet. Tr. at 325. He specifically testified that Torres did not flee in the direction of 12 o'clock or 1 o'clock. Tr. at 377-378. He also testified that Torres never ran toward the open end of 88th Avenue. Tr. at 378. By contrast, Detective Benitez testified that Torres ran toward the right, at an angle toward the fence or the alley at the dead-end. Tr. at 224, 251. Detective Benitez believed that Torres "was either going to hop over the fence or make a right in the alley." Tr. at 224. Detective Benitez stated that he was directly behind SA Butorac when Torres fled. Tr. at 225, 253. Like SA Butorac, Detective Benitez testified that Torres did not run toward the center of the dead-end or toward the open end of the street. Tr. at 251. Lastly, Detective Berberich testified that, after he moved into his left-flank position to the side of Torres, he saw Torres run toward the dead-end for five to fifteen feet. Tr. at 474-478. From his vantage point, it appeared that Torres ran directly toward the center of the dead-end, in the direction of the train tracks behind the fence; however, Detective Berberich could not be certain

whether Torres in fact ran at an angle toward the fence. Tr. at 474-478. Detective Berberich testified that Torres then reversed direction 180 degrees and ran directly toward the open end of the street – that is, in the direction of SA Butorac – for ten to fifteen feet. Tr. at 474-478, 480-481, 483-484.

<em>C.      The Force Used Against Torres</em>

The officers testified consistently about certain aspects of the force used against Torres. But with respect to material facts about the struggle on the ground, they gave inconsistent accounts. Moreover, Detective Berberich's trial testimony was inconsistent with his deposition testimony regarding several material facts about the struggle with Torres.

The officers testified that as Torres fled they all tackled him from behind at approximately the same moment. Tr. at 228, 254, 325-326, 482. Torres fell on the ground face forward, and the officers fell on his back. Tr. at 229-230, 254, 326, 482. On the ground, SA Butorac positioned himself on Torres' left side (that is, the side of Torres' left arm) and Detective Berberich was across from him, on Torres' right side; Detective Benitez was also located on Torres' left side, to SA Butorac's right, kneeling across Torres' legs. Tr. at 230-231, 331-332, 445, 484.[1] The officers yelled multiple commands at Torres, including telling him to give them his hands, while Torres actively resisted arrest by locking his hands beneath his chest and kicking and flailing his legs multiple times. Tr. at 231-232, 326-327, 440-441, 484-486. To gain Torres' compliance and place him under arrest, the officers used force against Torres during

---

[1] At his deposition in this case, Detective Benitez testified that he could not remember where Detective Berberich and SA Butorac were relative to Torres on the ground. Tr. at 261. At trial, though, he testified that SA Butorac had his hand on top of Torres' head and that Detective Berberich was located by Torres' torso area. Tr. at 231. On cross-examination, Detective Benitez explained the discrepancy between his deposition testimony and his trial testimony, stating: "During my deposition – I was called to a deposition that I had absolutely no clue about the case five years later. I didn't review anything. I didn't remember anything at that point." Tr. at 262. Upon further questioning, however, Detective Benitez admitted that prior to his deposition he had reviewed multiple case-related documents, including photographs, arrest reports, and the case file, and that he had spoken to his co-defendants and attorneys about the case. Tr. at 263. He then clarified that, since his deposition, he had been thinking more about the case; thus, he was able to recall more details. Tr. at 263-264.

a struggle that lasted only "seconds." Tr. at 233, 333, 402, 488.

SA Butorac testified that he used force against Torres in an attempt to get Torres to release his arms from underneath him. Tr. at 331-332. SA Butorac stated that he used his left thumb to apply force to pressure points behind Torres' left ear and along the left side of his jaw bone. Tr. at 328-329. SA Butorac testified that he then delivered one to three knee strikes to Torres' left thigh. Tr. at 330. Those tactics failed to gain Torres' compliance. Tr. at 329-331. Detective Berberich testified that he saw SA Butorac use a knee strike against Torres. Tr. at 448.

Detective Berberich testified that he also used force in an effort to get Torres to release his hands. During the struggle with Torres, he positioned himself on his knees by the middle of Torres' torso. Tr. at 484. There, he first used a wrestling technique called an "arm bar." Tr. at 442, 487. Using that technique, he attempted to use his forearm and hand as a pry bar to lift Torres' arm up. Tr. at 442. That technique failed to get Torres to release his arm. Tr. at 442-443. Detective Berberich then administered a scapula blow – a punch between Torres' shoulder blades designed to cause his "arm to go dead." Tr. at 443. SA Butorac testified that he saw Detective Berberich administer that blow, which he described as one punch to back, between the shoulder blades, not near the neck. Tr. at 332, 385. As a result of the scapula blow, Detective Berberich was able to pull one of Torres' arms free. Tr. at 445-446. Detective Berberich handcuffed that arm. Tr. at 446.

Detective Berberich testified that, at the time he pulled Torres' first arm free, he felt Torres kick him in the back. Tr. at 441, 488-489. His testimony in this regard is inconsistent not only with his own testimony, but also with that of Detective Benitez. As discussed above, Detective Berberich testified that, on the ground, he positioned himself on his knees by Torres' torso, not near Torres' legs. Tr. at 484. Detective Benitez, on the other hand, did position

himself near Torres' legs. According to Detective Benitez's testimony, when Torres landed face down on the ground, he fell on top of Torres' body, with his legs on top of Torres' legs. Tr. at 260. Torres kicked a couple of times while Detective Benitez was on top of him, and at least one kick struck Detective Benitez's legs. Tr. at 230, 259-260. Detective Benitez then immobilized Torres' legs by kneeling on them. Tr. at 231, 259. Thus, at the time Torres kicked him, not only was Detective Berberich not positioned near Torres' legs, but according to Detective Benitez's testimony, Detective Benitez was either lying or kneeling on top of Torres' legs.

Detective Berberich also testified that, at the time he pulled Torres' first arm free, Torres turned his head toward him, at which point Detective Berberich believed that Torres was going to bite his testicles or his leg. Tr. at 446, 489, 494-495. Detective Berberich's testimony – that Torres' head was insecure and that he was in danger of being bitten – is inconsistent with Detective Benitez's and SA Butorac's trial testimony. Furthermore, Detective Berberich gave conflicting trial and deposition testimony on this point. At trial, Detective Benitez testified that, on the ground, SA Butorac had his hand on top of Torres' head, "pressing his head against the pavement so that he couldn't move." Tr. at 231. Likewise, SA Butorac testified that, although he did not believe he had his hand on Torres' head during the entire struggle, "when [Torres] fell to the ground, his head was secured." Tr. at 381, 402. At that time, SA Butorac had his hand on the left side of Torres' face – the side facing away from Detective Berberich. Tr. at 381-382. As previously discussed, during the struggle, SA Butorac then used his left thumb to apply force to pressure points behind Torres' left ear and along the left side of his jaw bone. Tr. at 328-329, 381-382, 402. During his deposition testimony and initially at trial, Detective Berberich testified that he had no recollection of SA Butorac putting his hand on Torres' head; however, during cross-examination, he changed his testimony to conform to that of SA Butorac and Detective

Benitez, stating: "I may have seen Butorac with his hand on his head at one time, but then when Torres turned his head, I didn't see Butorac's hand."  Tr. at 490-492.[2]  Moreover, although he testified during his deposition that his testicles were not, in fact, near Torres' head, he contradicted that testimony at trial.  Tr. at 493-494.[3]

Detective Berberich testified that, because he feared being bitten, he attempted to secure

---

[2] In relevant portion, Detective Berberich's trial testimony states:

Q    So Special Agent Butorac was not in fact securing Mr. Torres's head.  Right?

A    I guess not.

Q    In fact, you had not seen any officer touch Mr. Torres in the head or neck up until that point.  Right?

A    I don't recall seeing anyone touching him in the head.

Q    So, so is it true to say that you had not seen any officer touch him in his head or neck up until that point?

A.    At this time in my testimony and my recollection of the incident, I don't recall seeing anyone – I may have seen Butorac with his hand on his head at one time, but then when Torres turned his head, I didn't see Butorac's hand.  And I felt that I may have been trying to be bitten and I, I relocated and repositioned my body so that I would not get hurt.

Q    . . . . Do you remember being asked the following question and giving the following answer [at your deposition]:

"Question: Before you put your knee on his body, did you see any officer touch him in the head or neck."

"Answer: To the best of my recollection, no."

A    If that's what my testimony was at the time I made deposition, that's what my recollection was at that particular time, sir.

Tr. at 490-491.

[3] In relevant portion, Detective Berberich's trial testimony states:

Q    Now, your testicles were not near Mr. Torres's head, were they?

A    My – they weren't – if he had reached his head up, he could have bitten me.  In my opinion, he would have had an opportunity to bite me in my cro[t]ch or inner leg.

Q    And, and would you say that then your testicles were near his, near his head?

A    I, I felt that my leg was in a position where I could get bitten and I wanted to get my leg out of there to protect myself.

Q    And my question is whether you would say that you testicles were near his head.

A    My whole body was near his head.  My leg was near his head.  Connected to the upper extremity of my leg is the human genitalia, my testicles.  Was it too close for comfort?  In my opinion, yes, sir.

. . . .

Q    Turning to page 269 of the deposition, do you recall being asked the following question and giving the following answer?

"Question: I believe that you stated earlier that you were afraid he might bite you in the testicles.  Were your testicles near his head at that time?"

"Answer:  No.  To answer your question, the answer is no, I don't recall my testicles near his head.  I have had in past occasions had people try to bite me while effecting an arrest and I don't want to get bitten in the testicles.  I don't want to get bit period."

Do you recall being asked that question and giving that answer?

A    Yes, I do.

Tr. at 493-494.

Torres' head by placing his knee on Torres' back for a "brief time" and using some of his body weight, but not his full weight, to hold down Torres. Tr. at 446-447, 494-495. During his trial testimony, Detective Berberich denied placing his knee on Torres' neck or in that vicinity. Tr. at 495.[4] That trial testimony, however, is inconsistent with his deposition testimony. At his deposition, Detective Berberich testified: "To prevent his head going and making, getting closer to me. I tried to remove my body away from where his head was. So I put [my knee] towards the back of his shoulder towards his neck area." Tr. at 496. He further testified at his deposition: "My knee made contact with his body. I don't know if it actually made contact with his neck or it didn't. It was in that vicinity, that is where I put my knee . . . ." Tr. at 496.

Finally, to get Torres to release his second arm, Detective Berberich testified that he utilized a "twisting technique" with the handcuffs on Torres' free arm. Tr. at 447. Detective Berberich stated that he twisted the handcuffs to inflict pain in Torres' wrist while he commanded Torres to release his other arm. Tr. at 447, 499. Following this twisting technique, either SA Butorac or Detective Benitez was able to pull Torres' other arm free, and the officers' handcuffed both arms behind his back. Tr. at 233, 333, 448.

In sum, the officers gave different accounts of the force used against Torres on the ground. Detective Berberich testified that he used the following force: an arm bar, a scapula

---

[4] In relevant portion, Detective Berberich's trial testimony states:

Q    Now, to secure Mr. Torres's head, you put your knee on the area of the back of his neck. Right?
A    On his back, sir.
Q    Well, it was – it was towards the back of his shoulder towards his neck area. Right?
A    Towards on the back – on his back but not on – I didn't put it on his neck.
Q    Do you know now that you did not put your knee on to his neck?
A    To the best of my recollection, I didn't place my knee on his neck.
Q    And did you place your – your knee in the vicinity of his neck?
A    I tried it [sic] put my knee on his back, sir.
Q    And did that result in your knee being placed in the vicinity of his neck?
A    To the best of my recollection, no, sir.

Tr. at 495.

blow, a knee on Torres' back, and a twisting technique with Torres' first cuffed arm. Tr. at 442-443, 445-447. He also testified that he saw SA Butorac use a knee strike against Torres. Tr. at 448. SA Butorac testified that he used the following force: pushing pressure points on Torres' left ear and jaw and one to three knee strikes against his left thigh. Tr. at 328-330. SA Butorac also saw Detective Berberich use a scapula blow against Torres. Tr. at 332. Detective Benitez testified that he did not use any force against Torres aside from kneeling on his legs and grasping his arms. Tr. at 232. Detective Benitez did not see Detective Berberich use a scapula blow against Torres or put a knee on his back. Tr. at 264. Despite being positioned on top of his legs, Detective Benitez did not see SA Butorac use knee strikes against Torres' left thigh. Tr. at 265.

D.     *The Officers' Actions Following Torres' Arrest*

After the officers handcuffed Torres, he was searched briefly for weapons. Tr. at 335, 450. The officers then assisted him to his feet by rolling him to his right, bringing him to his knees, and standing him up. Tr. at 336. The officers lifted Torres by grabbing his bicep, underarm, and waist areas. Tr. at 234, 387, 450. The officers testified that Torres was not lifted up by his handcuffs. Tr. at 234, 336, 450. In that regard, Detective Berberich stated: "If you lifted somebody . . . up with the handcuffs, there is a possibility you can pop the shoulder and you don't want to do that. You are not trying to inflict broken bones and things like that." Tr. at 451. After the officers stood Torres up, SA Butorac checked to ensure that the handcuffs were not too tight by sticking his little fingers inside the cuffs. Tr. at 335. The officers did not use any force against Torres after they handcuffed him. Tr. at 233, 335-336, 450-451.

The officers then brought Torres to an area near a car and did a more thorough search of him. Tr. at 336, 451. None of the officers questioned Torres at the dead-end. Tr. at 337, 453. Detective Berberich, however, explained to Torres that he had a "small window of opportunity"

to cooperate with the investigation. Tr. at 453. Inside Torres' vehicle, in plain view, SA Butorac observed the narcotics that Torres was transporting. Tr. at 338.

The officers then returned to the garage at 157th Street. Tr. at 339. There, in response to Torres' complaints of pain, Detective Berberich called an ambulance. Tr. at 456. SA Butorac and Detective Berberich testified that, although they each had a flashlight at the garage, they did not threaten Torres with it. Tr. at 342, 457-458. When the paramedics arrived, SA Butorac had no interaction with them. Tr. at 340-341. Detective Berberich told the paramedics Torres' name, but that was the extent of his interaction with them. Tr. at 458. Detective Benitez testified that he explained to the paramedics that Torres was injured when the officers' tackled him. Tr. at 238. Detective Benitez stated that he did not know the paramedics and that he did not ask them to "make a good report." Tr. at 239.

Detective Benitez and SA DiRenzo rode in the ambulance with Torres to Mary Immaculate Hospital. Tr. at 238-239, 459. Detective Benitez testified that at the hospital he did not tell any personnel to "make a good report." Tr. at 242.

E.    *Torres' Post-Arrest Interview*

At approximately 10:15 a.m. on the morning of September 7, 2005, at a DEA office, SA Butorac and Detective Berberich questioned Torres after he waived his <u>Miranda</u> rights. The interview lasted approximately 45 minutes. Tr. at 408. SA Butorac testified that at the outset of the interview Torres apologized for resisting arrest on the prior evening. Tr. at 410-411. SA Butorac could not recall whether Torres volunteered this apology or whether he apologized in response to questioning by the officers. Tr. at 409-410. He testified, though, that he did not ask Torres to apologize. Tr. at 412. SA Butorac took less than one page of notes during the interview; the notes contained eleven lines of text. Tr. at 408; Pl. Ex. 16. The first three lines of

his notes state: "10:15. Admits he should not have run. Apologized for not listening and resisting officers." Tr. at 409. The ninth and tenth lines of his notes respectively state: "Aware of police behind him" and "Realized didn't follow directions." Pl. Ex. 16. SA Butorac denied writing that Torres apologized in his notes in order to "make a good record." Tr. at 411. Detective Berberich also testified about the interview of Torres. He testified that Torres admitted that he did not listen to the officers' commands. Tr. at 524. Detective Berberich stated that during the interview he gave Torres a pen and a pad and asked him to make a written statement about his involvement in the drug trafficking. Tr. at 525. Detective Berberich told Torres that he would present the statement to the U.S. Attorney's office. Tr. at 525. Detective Berberich testified that he did not recall asking Torres to write an apology. Tr. at 525.

Following the interview, SA Butorac wrote an official report, known as a DEA-6, of the interview. Tr. at 411; Pl. Ex. 28. The DEA-6 is dated September 7, 2005. Pl. Ex. 28. Paragraph 5 of that report states:

> TORRES informed SA Butorac and Det. Berberich that he wanted to apologize for fleeing and resisting officers. TORRES stated he didn't pull over because he was afraid and that he had drugs in his vehicle. TORRES indicated when he came to the dead-end he panicked. TORRES admits that he resisted arrest by refusing lawful commands. TORRES stated he recalled attempting flee [sic] the area on foot, and not immediately placing his hands behind his back.

Pl. Ex. 28. at 2. SA Butorac testified that he is aware that DEA-6 reports may be used as evidence at trial. Tr. at 411. He denied, however, that he wrote paragraph 5 of the DEA-6 report in order to "make a good record for prosecutors." Tr. at 412.

IV.    Medical Testimony

At trial, three witnesses presented medical testimony about Torres' injuries stemming from his arrest.  Dr. Sappho Ong was the emergency room physician at Mary Immaculate Hospital who treated Torres on the night of his arrest.  Tr. at 603, 610-611.  Lieutenant Melinda Ruiz was a physician's assistant at the MDC, who conducted Torres' intake screening and physical examination on September 8, 2005.  Tr. at 616, 621-622; Def. Ex. I.  Dr. Robert Beaudouin is a physician at the MDC who examined plaintiff on three occasions, in March 2006, January 2007, and March 2009.  Tr. at 563-564, 567, 581, 592.

Neither Dr. Ong nor Lieutenant Ruiz had any independent recollection of treating Torres. Tr. at 604, 621.  Dr. Ong testified, based on her review of the medical records of her treatment of Torres, that she treated him for multiple abrasions to his face and knees.  Tr. at 611.  She ordered a CAT scan of his head, which was negative.  Tr. at 611-612.  She did not treat Torres for injuries to the neck, back, wrist, thumb, left ear, or torso.  Tr. at 611.  Lieutenant Ruiz testified, based on her review of the medical records of her treatment of Torres, that when she examined Torres, he had multiple abrasions to both sides of his face, his upper and lower extremities, his left ear, and his left thumb; his left thumb also had limited range of motion.  Tr. at 623-625; Pl. Ex. 35.  She did not note any injury to Torres' neck in her records.  Tr. at 624.

Dr. Beaudouin testified that, on each occasion he saw Torres, he treated him for chronic neck pain and decreased range of motion in the neck.  Tr. 568, 581-582, 593.  In March 2006, Dr. Beaudouin referred plaintiff to a neurologist for a follow-up consultation about his neck and prescribed him pain medication.  Tr. at 569.  The neurologist diagnosed plaintiff "with cervicalgia with decreased range of motion, cervical muscle spasm, [and] left wrist strain."  Tr. at 582.  She prescribed muscle relaxers and ordered an MRI of Torres' neck to rule out disc

herniation if he did not respond to the muscle relaxers. Tr. at 582-584. When Dr. Beaudouin examined Torres in January 2007, Torres reported worsening neck pain and stiffness and tingling in his back and fingers. Tr. at 582. Dr. Beaudouin prescribed pain medication. Tr. 582. In March 2009, when Dr. Beaudouin again examined him, Torres reported constant neck pain and a decreased range of motion in his neck. Tr. at 593. Dr. Beaudouin concluded that Torres had tenderness in the neck and that he did not have a full range of motion. Tr. at 594-595. Dr. Beaudouin prescribed him pain medication and submitted a consult for him to have an MRI of his neck. Tr. at 596.

I note that, at trial, Torres showed signs of having an injury to his neck consistent with Dr. Beaudouin's testimony. Throughout trial, Torres appeared to have a limited ability to move his neck. In particular, during his testimony, Torres did not turn his neck to the left or right; rather, in order to look to either side, Torres turned his entire torso while keeping his neck static.

V.      The Parties' Arguments at Trial

Plaintiff argued that the evidence at trial demonstrated that, after he exited his vehicle at the dead-end on 88th Avenue, he followed the officers' commands and submitted to their authority. He asserted that he did not flee or resist arrest. Rather, while he was submitting to their authority, the officers attacked him without provocation and utilized an objectively unreasonable amount of force under the Fourth Amendment and New York law in effecting his arrest. As a result of the officers' use of unreasonable force, plaintiff sustained permanent injuries, including a chronic neck injury that severely limits his activities. Plaintiff argued that the arresting officers' version of events at the dead-end is incredible, as demonstrated by their inconsistent statements about material facts and the implausible, self-serving statements memorialized in SA Butorac's notes and DEA-6 report.

By contrast, defendants argued that the evidence at trial demonstrated that Torres fled from the arresting officers and resisted arrest after he exited his vehicle at the dead-end. The officers, in response, used reasonable force under the Fourth Amendment and New York law to effect plaintiff's compliance. Defendants argued that plaintiff sustained no more than minor abrasions as a result of the officers' use of force; they claimed that plaintiff does not have a chronic neck injury, as evidenced by the fact that he did not complain about that injury in the days following his arrest. Defendants also argued that plaintiff's version of events at the dead-end is not credible, as demonstrated by the facially implausible statements that he made during his testimony.

## DISCUSSION

I.    Standard of Proof

"In a civil case, the plaintiff bears the burden of proving the elements of his claim by a preponderance of the evidence." Brown v. Lindsay, Nos. 08-CV-351, 08-CV-2182, 2010 U.S. Dist. LEXIS 26101, at *29-*30 (E.D.N.Y. March 16, 2010). "To establish a fact by a preponderance of the evidence means to prove that the fact is more likely true than not true." Id. at *30 (citing Fischl v. Armitage, 128 F.3d 50, 55 (2d Cir. 1997)). "The preponderance standard is no more than a tie-breaker dictating that when the evidence on an issue is evenly balanced, the party with the burden of proof loses." United States v. Gigante, 39 F.3d 42, 47 (2d Cir. 1994), amended, 94 F.3d 53 (2d Cir. 1996); see Kosakow v. New Rochelle Radiology Assocs., 274 F.3d 706, 731 (2d Cir. 2001) ("[W]here the burden of proof is a preponderance of the evidence, the party with the burden of proof would lose in the event that the evidence is evenly balanced.").

II.     <u>Legal Standards</u>

     A.     *Excessive Force under the Fourth Amendment*

 "Where . . . [an] excessive force claim arises in the context of an arrest . . . of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment, which guarantees citizens the right 'to be secure in their persons . . . against unreasonable . . . seizures' of the person." <u>Graham v. Connor</u>, 490 U.S. 386, 394 (1989).  Under <u>Bivens</u>, a plaintiff may recover money damages against an officer acting under color of federal law for using excessive force in violation of the Fourth Amendment in effecting his arrest.  <u>Id.</u> at 394 n.9; <u>Tavarez v. Reno</u>, 54 F.3d 109, 110 (2d Cir. 1995).

     "Police officers' application of force is excessive, in violation of the Fourth Amendment, if it is objectively unreasonable 'in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.'" <u>Maxwell v. City of New York</u>, 380 F.3d 106, 108 (2d. Cir. 2004) (citing <u>Graham</u>, 490 U.S. at 397).  "[T]he right to make an arrest . . . necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." <u>Graham</u>, 490 U.S. at 396.  Indeed, "not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers . . . violates the Fourth Amendment." <u>Id.</u> (citations and internal quotation marks omitted).  "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." <u>Id.</u>  Because "[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application . . . , however, its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to

evade arrest by flight." Id. (citations and internal quotation marks omitted). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation." Id. at 396-397.

### B.    The Federal Tort Claims Act

Under the FTCA, the United States is liable for the "negligent or wrongful acts or omissions of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). Although the FTCA generally bars claims of assault and battery committed by federal employees, it permits such claims when the alleged assault and battery was committed by "investigative or law enforcement officers." 28 U.S.C. § 2680(h). An "investigative or law enforcement officer" is defined as "any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law." Id. Thus, in this case, the United States may be held liable if the arresting officers, acting within the scope of their employment, committed an assault and battery against plaintiff under New York law.

"Under New York law, an 'assault' is an intentional placing of another person in fear of imminent harmful or offensive contact. A 'battery' is an intentional wrongful physical contact with another person without consent." Girden v. Sandals Int'l, 262 F.3d 195, 203 (2d Cir. 2001) (citations and internal quotation marks omitted). To establish that a law enforcement officer committed assault and battery, a plaintiff must prove that the officer's "conduct was not reasonable within the meaning of the New York statute concerning justification of law enforcement's use of force in the course of their duties." Nimely v. City of New York, 414 F.3d

381, 391 (2d Cir. 2005) (citations omitted).  That statute provides, in relevant part: "A police officer or a peace officer, in the course of effecting or attempting to effect an arrest . . .  may use physical force when and to the extent he or she reasonably believes such to be necessary to effect the arrest . . . ."  N.Y. Penal Law § 35.30 (1).  "Thus, in effect, the test for whether a plaintiff can maintain [a state-law assault-and-battery] cause of action against law enforcement officials is . . . the exact same test as the one used to analyze a Fourth Amendment excessive force claim."  Kavazanjian v. Rice, No. 03-CV-1923 (FB) (SMG), 2008 U.S. Dist. LEXIS 103881, at *21 (E.D.N.Y. Dec. 22, 2008) (alteration and ellipsis in original; citation and internal quotation marks omitted).

III.    Analysis

At the outset, I note that the parties have stipulated that the arresting officers were acting under color of federal law and within the scope of their employment with the United States when they arrested plaintiff on September 6, 2005.  Accordingly, the only question I must decide under the Fourth Amendment and New York law is whether, in light of all the facts and circumstances confronting them, the officers used objectively unreasonable force in effecting plaintiff's arrest.

At trial, the parties presented two very different accounts of plaintiff's arrest.  According to plaintiff's testimony, at the end of the high-speed chase, he exited his vehicle, faced the officers, promptly followed their commands, and clearly manifested his submission to their authority.  While plaintiff was surrendering, the officers gratuitously and severely beat him.  Under plaintiff's version of events, without question, the officers' actions would be objectively

unreasonable.[5]  By contrast, according to the arresting officers' testimony, at the dead-end, plaintiff exited his vehicle, disobeyed the officers' commands, fled on foot and, after the officers tackled him, actively resisted arrest by locking his hands beneath his chest and kicking and flailing his legs.  The officers then used only the force necessary to subdue plaintiff and pull his hands free, so that they could handcuff plaintiff behind his back.  Under the officers' version of events, without question, their actions would be objectively reasonable.[6]

Because the parties have presented such disparate versions of plaintiff's arrest, in order to determine whether the officers acted reasonably under the circumstances of this case, I must resolve two critical factual questions.  First, at the dead-end, did plaintiff take actions that a reasonable officer would have understood as submission to authority as opposed to resistance?  If plaintiff did clearly surrender, and the officers used any force against him after he surrendered, that force would be objectively unreasonable.  Second, what level of force did the officers use against plaintiff in effecting his arrest?  Even if plaintiff fled or otherwise resisted arrest, if the officers' used force against him that was grossly disproportionate to his resistance and unnecessary to effectuate his arrest, that force would be objectively unreasonable.

The trial evidence regarding these two critical questions is limited.  Plaintiff's testimony and the testimony of the arresting officers is the only testimony before me regarding plaintiff's arrest, and the minimal documentary evidence presented at trial sheds no light upon what

---

[5] See, e.g., Davis v. Rodriguez, 364 F.3d 424, 437 (2d Cir. 2004) (affirming district court's jury instructions because the court "made it clear that if the jury believed [plaintiff's] story including that he had docilely submitted to the blows of [defendants], the jury would have to find the officers liable for unconstitutional use of excessive force."); Pierre-Antoine v. City of New York, No. 04 Civ. 6987 (GEL), 2006 U.S. Dist. LEXIS 28963, at *12-*13 (S.D.N.Y. May 9, 2006) (finding that defendants' actions would be objectively unreasonable if plaintiff established that the "officers repeatedly punched, kicked, and stomped on him, despite the fact that he did not fight back and despite his repeated attempts to explain that he was disabled.").

[6] See, e.g., Graham, 490 U.S. at 396; McKenna v. Hughes, No. 06-CV-2895, 2008 U.S. Dist. LEXIS 5362, at *8-*9 (E.D.N.Y. Jan. 23, 2008) (where plaintiff was non-compliant with officers' orders, verbally challenged their authority, and clenched his fists facing the officers, officers use of force was reasonable); Jackson v. City of New York, No. 01-CV-10116, 2005 U.S. Dist. LEXIS 12986, at *112 (S.D.N.Y. June 29, 2005) (finding officer's use of force reasonable because plaintiff admitted to struggling with him).

transpired at the dead-end.  It is therefore necessary to evaluate the witnesses' credibility to resolve these factual disputes.

After considering the credibility of the parties, and after weighing their testimony and the other evidence before me, I conclude that the evidence regarding the two key factual questions in this case is in equipoise.  I thus hold that plaintiff has failed to establish that the officers used objectively unreasonable force in violation of the Fourth Amendment and New York law.

A.    *The Parties Credibility*

In assessing the credibility of the parties' testimony, I recognize the inherent limitations of their perception and memory.  The arrest at issue here took place six years ago, during a few brief, chaotic moments at the end of a dangerous high-speed chase.  Undoubtedly, the individuals present during that event perceived it slightly differently from each other and thus different actions stand out in each individual's mind.  Moreover, as time passed after the event, and especially as subsequent litigation ensued, each individual inevitably reconstructed his memory in a manner that supported his basic conception of what occurred.  As a byproduct of that process, inaccurate details likely emerged and became engrained in the memory of each witness.  Consequently, some inconsistencies are to be expected in each witness' testimony; and many of those inconsistencies may be explained without impugning the witness, as the inculpable result of misperception or faulty memory.  Nonetheless, even taking the foregoing considerations into account, I have significant concerns about the veracity of the testimony by all the parties in this case.

i.    Plaintiff's Credibility

With respect to plaintiff's testimony, I have concerns about several aspects of his version of events, including his testimony regarding certain material facts.  Specifically, I find the

following four aspects of his testimony troubling.

First, I am unconvinced by his testimony that on 157th Street SA DiRenzo blocked his path without turning on his emergency lights. When SA DiRenzo executed the blocking maneuver, he was attempting to apprehend plaintiff. I see no reason why he would have blocked plaintiff's path without activating his emergency lights.

Second, I have serious doubts about plaintiff's testimony that, throughout the high-speed chase, and even after exiting his car and facing the officers on 88th Avenue, he thought his pursuers could have been robbers impersonating police officers. Plaintiff admits that, eight or nine blocks into the chase, he saw the emergency lights activated on the officers' vehicles and, at some point during the chase, he heard their sirens. At the dead-end, he saw a line of cars stopped behind him and officers with their guns drawn and badges displayed. No reasonable person could have believed that robbers would take such attention-drawing actions as (i) proceeding on a five to eight mile, high-speed chase through Queens with emergency lights and sirens activated on their vehicles and (ii) lining a residential street with those vehicles and exiting them with guns drawn.

Third, plaintiff's testimony that he surrendered to the officers at the dead-end is questionable. At 157th Street, plaintiff made the decision to flee from the officers. He then led the officers on a high-speed chase through Queens. Admittedly, he was "panicked" during the chase. When he arrived at the dead-end, it was not completely enclosed; rather, at the end of the street, there was a chain-link fence with a hill behind it and, on either side of the street, there were residential homes with driveways or alleyways in between them. Thus, although the officers were rapidly closing in on him, plaintiff was not trapped. Under such circumstances, when plaintiff was "panicked" and had potential avenues of escape available to him, I question

whether he simply gave up his attempt to out-run the officers when he reached 88th Avenue.

Fourth, I am dubious of plaintiff's testimony that (i) Detective Benitez asked a paramedic to "make a good report" and (ii) one of the officers asked a nurse at the hospital to "make a good report." There is no evidence in the record suggesting that there was a prior relationship between any of the arresting officers and either the paramedic or the nurse. Plaintiff has offered no convincing reason why a medical professional, with no prior relationship to the officers, would collude with them to cover up or minimize plaintiff's injuries.

        ii.      The Arresting Officers' Credibility

While I find certain aspects of plaintiff's testimony incredible, I also have serious concerns about the testimony of the arresting officers. Many of these concerns relate to the officers' testimony about material facts in this case.

Most notably, while the arresting officers all testified that plaintiff fled on foot at the dead-end, each of them stated that plaintiff fled in a different direction. SA Butorac testified that plaintiff fled to the left. Although Detective Benitez testified that he was directly behind SA Butorac while plaintiff fled, he saw plaintiff flee to the right. From the vantage point of his left flank position, Detective Berberich saw plaintiff flee directly toward the center of the dead-end, and then reverse direction and flee ten to fifteen feet toward the open end of the street, in the direction of SA Butorac. Detective Berberich's account directly conflicts not only with the testimony of SA Butorac and Detective Benitez that plaintiff did not flee toward the open end of the street, but also with the testimony of all three officers that they tackled plaintiff from behind. It is possible that the officers' divergent and inconsistent testimony is the product of misperception or faulty memory on the part of one or more of the officers. But each officer testified that he observed plaintiff's flight from a close range, and each officer described the

direction of his flight in detail. Thus, their vastly disparate testimony about this critical fact is disquieting; and, at best, it undermines their reliability.

With regard to the officers' testimony about the struggle on the ground with plaintiff, the foregoing discussion about the inherent limitations of perception and memory is particularly apt. The struggle on the ground was a frantic, tense incident about which different individuals will likely have different recollections, and inconsistencies in testimony about such an event are to be expected. I am, nonetheless, doubtful about the following five aspects of the officers' testimony.

First, I am perplexed by Detective Berberich's testimony that Torres kicked him in the back. Throughout the struggle, Detective Berberich was kneeling next to Torres' torso and Detective Benitez was lying or kneeling on Torres' legs. Torres was lying face down on the ground. Based on the positions of the two officers and Torres, it is unclear how plaintiff possibly could have kicked Detective Berberich in the back.

Second, the testimony of SA Butorac and Detective Benitez undermines Detective Berberich's testimony that Torres' head was insecure and that he feared Torres would bite him. Detective Benitez testified that during the struggle SA Butorac had Torres' head pressed against the pavement and immobilized. Likewise, SA Butorac testified that "when [Torres] fell to the ground, his head was secured." Tr. at 402. Further, although he did not believe that he had his hand on Torres' head the entire time, SA Butorac testified that, during a struggle that lasted only seconds, he was pressing pressure points on the left side of Torres' face, the side turned away from Detective Berberich. Thus, Detective Berberich's assertion that Torres' head was insecure and that he feared being bitten is in direct conflict with the testimony of his co-defendants.

Third, I am troubled by Detective Berberich's shifting testimony. At his deposition and initially at trial, Detective Berberich testified that he did not see SA Butorac securing Torres'

head. On cross-examination at trial, though, he changed his testimony to conform to that of his co-defendants, stating: "I may have seen Butorac with his hand on his head at one time, but then when Torres turned his head, I didn't see Butorac's hand." Tr. at 490. Similarly, at his deposition, Detective Berberich testified that his testicles were not near Torres' head. At trial, he contradicted that testimony and asserted that Torres could have bitten his testicles if he reached his head up. Moreover, during his deposition, Detective Berberich testified that he placed his knee on "the back of [Torres'] shoulder towards his neck area" and in the "vicinity" of his neck. At trial, Detective Berberich changed that testimony, denying that he placed his knee on plaintiff's neck or in that vicinity. All of the alterations in Detective Berberich's testimony buttress his version of events and therefore raise considerable questions about his testimony.

Fifth, I find it difficult to comprehend how Detective Benitez did not see SA Butorac use one or more knee strikes against Torres' left thigh. During the struggle with Torres, Detective Benitez testified that he was kneeling on Torres' legs. In that position, it seems unlikely that he would miss SA Butorac striking Torres' left thigh. His testimony in this respect raises doubts about his testimony that he did not see the other officers use any force against plaintiff.

With respect to SA Butorac's notes from and report of plaintiff's September 7, 2005 post-arrest interview, I find his account of that meeting questionable. Specifically, it seems unlikely that at the outset of the interview plaintiff volunteered an apology for fleeing and resisting arrest at the dead-end. I also find the prominence of SA Butorac's discussion of that apology in his report striking; it is unclear why such a detailed account was necessary.

B.      *The Weight of the Evidence*

Based on the preceding analysis, I find the testimony of plaintiff and each of the arresting officers unreliable in material respects. After reviewing their testimony, I am left with no clear

conception of what occurred when plaintiff was arrested at the dead-end on 88th Avenue.  I fully

credit neither plaintiff's version of events nor that of the officers.  In particular, regarding the

critical questions in this case – whether plaintiff clearly surrendered and what level of force the

officers used against him – I have serious doubts about the testimony of each witness.

Considering the circumstances surrounding his arrest, and my concern that plaintiff embellished

portions of his testimony, I cannot conclude that he clearly surrendered at the dead-end and that

the officers then severely and gratuitously beat him.  Likewise, in light of the material

inconsistencies in the officers' testimony – especially their divergent testimony about the

direction in which plaintiff fled and the troubling contradictions in their testimony about the

struggle on the ground – I cannot conclude that plaintiff fled or took other actions that

manifested resistance and that the officers then used only the force necessary to effect his arrest.

> After weighing the parties' testimony and the other evidence before me, I conclude that

the evidence is in equipoise.  I believe that it is equally likely that plaintiff clearly surrendered at

the dead-end as it is that he fled or otherwise took actions manifesting resistance.  I also believe

that it is equally likely that the officers gratuitously and severely beat plaintiff as it is that they

used only the force necessary to effect his arrest.[7]  I therefore cannot find by a preponderance of

---

[7] I do not doubt that, as a result of the force used against him, plaintiff sustained permanent injuries, including a chronic neck injury.  I am not persuaded by defendants' argument that plaintiff's failure to complain about his neck pain in the days immediately following his arrest demonstrates that he does not have a chronic neck injury.  On the contrary, I credit plaintiff's testimony regarding his neck injury and Dr. Beaudouin's testimony that he has diagnosed plaintiff with and repeatedly treated him for such an injury.  That testimony is bolstered by my observations of plaintiff's condition at trial.  The testimony by Dr. Ong and Lieutenant Ruiz does not undermine the testimony by plaintiff and Dr. Beaudouin.  Neither Dr. Ong nor Lieutenant Ruiz testified that plaintiff did not develop or would not have developed a chronic neck injury subsequent to their treatment of him.  Defendants have offered nothing more than speculation to support their assertion that plaintiff is feigning his neck injury, and I dismiss that argument without hesitation.

I cannot, however, infer that the officers used objectively unreasonable force against plaintiff from the fact that he suffered a chronic neck injury.  There is no evidence in the record suggesting that plaintiff could have sustained a chronic neck injury only if the officers used the level of force against him that he described in his testimony.  Indeed, it seems quite likely that plaintiff could have sustained such an injury as a result of the force the officers admitted using against him in their testimony.  While I am sympathetic to the fact that plaintiff sustained injury as a result of the officers' actions, his injury does not tip the balance in either direction in this case.

the evidence either (i) that plaintiff clearly surrendered and that the officers then used force against him or (ii) that although plaintiff resisted arrest, the officers used force grossly disproportionate to that resistance and unnecessary to effectuate his arrest.

Accordingly, solely because plaintiff bears the burden of proof in this case, and despite my concerns about the veracity of the arresting officers, I am constrained to find that the officers did not use objectively unreasonable force in effecting plaintiff's arrest.[8]  I thus conclude that the officers did not use excessive force in violation of the Fourth Amendment nor did they commit assault and battery under New York law.

---

[8] With respect to plaintiff's contention that the officers used objectively unreasonable force against him after he was handcuffed, such as lifting him by his handcuffs, throwing him against a police car, and threatening him with a flashlight, I conclude that plaintiff has not established those facts by a preponderance of the evidence.  In this regard, the officers' consistent testimony that these events did not occur is more plausible than plaintiff's testimony.

## CONCLUSION

For the foregoing reasons, I hold that SA Butorac, Detective Benitez, and Detective Berberich did not use excessive force in violation of the Fourth Amendment and that they did not commit assault and battery under New York law. Thus, the officers are not liable to plaintiff under Bivens, and the United States is not liable to plaintiff under the Federal Tort Claims Act.

The Clerk of Court is directed to enter judgment accordingly.

SO ORDERED.

/s/ARR_____
Allyne R. Ross
United States District Judge

Dated:       August 1, 2011
             Brooklyn, New York